**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )**CRIMINAL NO. SA-11-CR-425-FB** |
| | ) |
| **ABDULLAHI OMAR FIDSE,** | ) |
| | ) |
| **Defendant.** | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

COMES NOW, the United States of America, by and through its undersigned counsel, Mark T. Roomberg, Assistant United States Attorney, and hereby files its Sentencing Memorandum, and states:

**Statement of the Case**

On May 25, 2011, the grand jury sitting in San Antonio indicted the defendant for Conspiracy to Obstruct an Immigration Hearing in violation of Title 18, United States Code, Sections 371 and 1505, and for Conspiracy to Make False Statements in a Terrorism Investigation in violation of Title 18, United States Code, Sections 371 and 1001. On October 3, 2012, the grand jury returned a superseding indictment adding four charges against Defendant Fidse: Counts Three through Five charged the Defendant in three substantive counts of Making False Statements in a Terrorism Investigation, in violation of Title 18, United States Code, Section 1001, and Count Six charged the defendant with a substantive count of Obstructing an Immigration Hearing in violation of Title 18, United States Code, Section 1505. The Defendant pled guilty to Counts One and Two without a plea agreement.

**Statement of the Facts**

Had this case proceeded to trial, the United States would have offered evidence proving each overt act of both conspiracies beyond a reasonable doubt including: (1) the eyewitness testimony of the Defendant's coconspirator Deka Sheikh as well as the testimony of CHS 2; (2) the recordings and translations thereof the Defendant discussing his terrorist activities with CHS 2 and his collusion with Sheikh regarding obstructing Fidse's immigration hearing and lying to the Joint Terrorism Task Force investigating Fidse's terrorism ties; (3) telephone records from the Defendant's calls in DHS custody as well as from the memory chip found in Fidse's personal belongings; and, (4) documentary evidence provided by the Kenyan government.  At the sentencing hearing, the United States will offer this evidence to support the findings of the Presentence Investigative Report, including but not limited to, the correct finding that the Terrorism enhancement pursuant to U.S.S.G. § 3A1.4 applies in this case.

At sentencing, case agent Mark Wagoner, a Federal Bureau of Investigation special agent assigned to the San Antonio Joint Terrorism Task Force, will briefly testify for background purposes as to the facts, history, formation, and associations of Al-Shabaab, a designated Foreign Terrorist Organization (FTO) including the following:  (1)   The history of the Al-Shabaab; (2) The Ethiopian National Defense Forces (ENDF) invasion of Somalia in late 2006 and 2007 to include fighting in Idaale, Somalia; (3) The designation of the Al-Shabaab as a FTO in 02/2008; and, (4) Radical Global Jihadist activity in relation to the Al-Shabaab such as the Taliban, the implementation of Sharia law, and Al-Shabaab support in fighting with radical global jihadists outside of Somalia.

Agent Wagoner will testify that Somalia is located on the easternmost edge of Africa

2

which is bordered by other countries which include Ethiopia and Kenya. It was engulfed in conflict which began in1991 and is considered a clan-based country which lacked a central government.  Consequently,  the Islamic  Court Union (ICU), which  practiced extremist  Islamic beliefs, invaded various southern areas of Somalia and began fighting for political power  and control  over  territories  and  resources.  The ICU was responsible for countless murders.  In 2004, the Transitional Federal Government (TFG) was formed and re-established the Military of Somalia.  With the assistance of Ethiopian government, the TFG took control  of the nation's southern conflict zone from the ICU.  Although the ICU was dissolved, Islamic militia members subsequently splintered into more radical groups such as Al-Shabaab, an extremist Islamic terrorist group and a Foreign Terrorist Oganization (FTO) as designated by the United States. The Immigration Court Found Fidse not to be credible and denied his asylum claim.

Fidse and Deka Abdalla Sheikh arrived at the Hildalgo, Texas, Port of Entry (POE) on June 24, 2008, claiming asylum.  Neither individual had any identification when they entered the U.S. so there are no assurances that they are whom they claim to be.  Fidse, with Sheikh acting as the interpreter, claimed asylum based on that Fidse's father being murdered by "al-Qaida" in the father's store in Mogadishu, Somalia, and that Fidse was present during the murder.  Fidse further claimed that he met Sheikh for the first time in the Addis Ababa, Ethiopia airport after fleeing Somalia following his father's alleged murder.  In her debriefing, Sheikh stated that Fidse had been living in Kenya since grade school and that Fidse told her his father had died years before of natural causes.

In recorded conversations between Fidse and Sheikh while Fidse was incarcerated in the DHS Enforcement and Removal Operations (ERO), Sheikh states they are married and had lived

together for three years.  In her debriefing, Sheikh stated that she met Fidse in March 2008 and

had limited interaction with him until they left Kenya in June 2008 and traveled to Dubai, Russia,

Cuba, Belize, Mexico, and walked across the border in Hidalgo, Texas, on June 24, 2008.  While

admitting the ERO recordings were correct, she maintained that she just said those things to

make Fidse happy.  The discrepancy between the recordings and the explanation might derive

from the cultural stigma and Sharia penalties for unsanctioned relationships.

    In his June 24, 2008, I-589 DHS Asylum form, filled out at DHS-ERO Pearsall, Fidse

repeated the claim that he met Sheikh for the first time in Addis Ababa and then claimed his

father was allegedly killed by "the Islamic Courts" with no mention of al-Qaida.  Sheikh, both in a

recorded conversation with the defendant and in her debriefing, admitted that Fidse told the

CBPO Arturo Castillo that his father was killed by "al-Qaida" or "al-Shabaab."

    In Fidse's December 15, 2008, removal hearing before the immigration court, Fidse and

Sheikh repeated their assertions that Fidse's father was murdered by "the Islamic Courts" and not

al-Qaida and that Fidse met Sheikh for the first time in the Addis Ababa, Ethiopia airport after

fleeing Somalia following his father's alleged murder.  Sheikh has since admitted they discussed

the false testimony beforehand and that they would stick to the initial false story.

    Following the December 15 hearing and in anticipation of the February 17, 2009,

scheduled hearing, there are numerous recorded phone calls from Fidse at the ERO facility to

Sheikh.  In these conversations, the two discussed they had lived together for three years and were

married.  In these calls, the two targets rehearsed Sheikh's testimony for the upcoming

continuation of Fidse's removal hearing and discuss hand signals Fidse would use to help Sheikh

tailor her testimony to Fidse's; in particular, they rehearsed when they met and to say that Fidse

told the CBPO officer during the initial June 24, 2008, interview at the POE that "the Islamic Courts" killed his father and not al-Qaida; however, in one of the conversations, Sheikh told Fidse that she thought he did in fact tell the CBPO officer that Fidse said it was "al-Shabaab" or "al-Qaida" that murdered his father.

In January 2009, the Joint Terrorism Task Force (JTTF) began investigation Fidse because of Fidse's open discussions with CHS 1 of his support for violent, radical Jihad, and the killing of non-Muslims, and his admiration for Osama Bin Laden.  Recorded conversations between Fidse and CHS 1 revealed Fidse discussing a detailed attack on the way the Al-Shabaab could kill the U.S.  Ambassador in Kenya.[1]

On March 31, 2009, the Immigration Court denied Fidse's asylum motion and ordered him removed.  The Court focused on Fidse's credibility and his inability to get his story straight on who killed his father.  Fidse initially appealed the Court's order, but withdrew his appeal on July 1, 2009.  The immigration court ordered Fidse removed from the United States, but because Fidse was a Somali national and travel documents could not be obtained from that country, he could not be sent to Somalia and would have had to have been released in the United States if not successfully prosecuted.

While still in ERO custody, Fidse made recorded comments to CHS 2 on June 3, 2009, where he claimed he purchased an armed "technical" and that the vehicle and weapons were

---

[1]These recordings as well as the other relevant recordings made in the ICE detention facility by CHS 2 and the recorded conversations between Fidse and Sheikh are set forth in the Appendix of this sentencing memorandum.

destroyed and all the fighters on it were killed.[2]   In her debriefing, Sheikh stated that Fidse's

sister Shamsho, with whom he was raised in Kenya, is a very wealthy businesswoman and the

possible source of funds by which Fidse raised the money for the armed technical.

JTTF agents interviewed Fidse on December 8, 2009.  Fidse was informed that the JTTF

was conducting a terrorism investigation into his activities; Fidse was Mirandized and was asked

questions about his weapon purchases and terrorism ties.   Upon hearing the CHS 2 recording

regarding the purchase of the armored technical, Fidse claimed it was not his voice and that the

JTTF agents doctored the recording to make is sound like Fidse.  He then said he would not say if

it was his voice or not.  Fidse had told CHS 1 that he admired Osama Bin Laden (OBL), al-Qaida,

and al-Shabaab, but when asked if he made such comments by the JTTF agents during the same

interview, Fidse denied saying it claiming that "Osama Bin Laden is a lie."  Later on in the

interview when confronted by the agents again, Fidse admitted he did say supportive statements of

OBL.[3]  Fidse also claimed his father was murdered in Mogadishu in 2008 by the Islamic Court in

Fidse's presence.  However, in her debriefing, Sheikh stated Fidse told her his father died of

natural courses many years before and that he had been living in Kenya for many years where he

---

[2] Defense counsel has provided alternative translations of the CHS 2 conversations.  The
translations were done by one of the FBI contract interpreters for the ERO calls.  While the
defense's translations are materially the same given the language differences, the defense
translations include favorable statements for the government where the government translations
were listed as inaudible, i.e., the defense translation includes a statement from the defendant
where he says, "We are terrorists."

[3] CHS 1 is not available as a witness.  CHS 1 was released from ERO custody and
given Deferred Action of his order of deportation which allowed him to remain in the country
and be a witness.  After CHS 1 threatened to go to the media about the investigation if FBI did
not give him more payments, his Deferred Action was revoked and he was deported.  At the time
CHS 1 was making these threats, CHS 2 was still operating undercover in DRO-Pearsall.

went to grade school and middle school.

After the December 8, 2009, interview of Fidse by the JTTF, there are two more recorded phone conversations between Fidse and Sheikh where Fidse warns Sheikh of the terrorism investigation and that the agents will be coming to talk with her.  Based on the recorded conversations and Sheikh's debriefing, Fidse and Sheikh again rehearsed what she will say and Fidse instructed Sheikh to contact an identified individual to have her records and fingerprints destroyed in Kenya since they will show she was not in Ethiopia at the time she claimed on her asylum paperwork.

In both a February 22, 2010, interview and a September 29, 2010, proffer, Sheikh was informed that she was being questioned in regard to a terrorism investigation involving Fidse. Sheikh continued to maintain that she never met Fidse before the Addis Ababa airport and leaving for the U.S.

On September 20, 2012, following her guilty plea, Sheikh admitted she had lied about: (1) the date and location where she met Fidse; (2) the method in which they were smuggled; (3) that she conspired with Fidse to make false statements to facilitate and approve his political asylum process; and, (4) their relationship.  She stated she initially lied and wanted to help him because he paid for items during their travel and also helped smuggle her into the United States.  Sheikh added she continued lying to officials because she feared she would lose her U.S. immigration status and be deported.  She first met Fidse in March 2008 in Kenya when she went to the offices of a human smuggler.  Sheikh learned Fidse was of the Somali, Hawiye, Murusade sub-clan and resided with his sister.  Sheikh also provided information regarding his family which included an aunt, Samira a/k/a Sahra Ahmed Adan, who resides in Minnesota  and

an uncle who resides in North Carolina. However, she later learned that Sahra was his sister. While in Reynosa, Fidse had contact with Sahra who advised them to create a story to obtain political asylum. Sheikh stated Fidse immediately created the story that his father had been killed by Islamic extremists in Mogadishu, Somalia and that he fled to Ethiopia. Sheikh added that she knew Fidse was able to understand English, but told authorities that he was unable to speak English and interpreted for him to support Fidse's political asylum claim. Sheikh reported the story regarding her family was true, but admitted she lied on Fidse's behalf as she knew his father had died of natural causes.

Subsequent to Fidse's arrest, FBI received all of Fidse's property. An inventory search determined Fidse maintained a Scandisk Memory Stick Micro 1.0 GB Memory Card (Memory Card). In late June 2011, the FBI executed a search warrant on the memory card. An analysis of the results of the execution of the search warrant indicated Fidse maintained an address book in the Memory Card. The address book included approximately 192 telephone numbers to include several Kenyan numbers for which Fidse called from the DHS detention center corroborating this was in fact his telephone memory card; these numbers included names and numbers of Fidse's family members and his home in Kenya as well as having personal photographs of himself on the memory card. Of particular interest was the following name and telephone number: "254722366634 H- mohamed." This telephone number was the same number linked to Mohamed Hamid Sulieman (Sulieman) also known as Abu Zanaib. This is significant in that on July 7, 2010, suicide bombings were carried out against crowds watching a screening of the 2010 FIFA World Cup Final at two locations in Kampala, Uganda which left 74 dead and 70 injured. The Al-Shabaab publicly claimed responsibility for these attacks. The Wall Street

Journal quoted an unnamed Al-Shabaab senior leader as follows, "We have reached our objective. We killed many Christians in the enemy capital (Kampala)." On August 14, 2010, the Kenyan Anti-Terrorism Police Unit (ATPU) arrested Sulieman for his participation in the Al-Shabaab  Uganda bombings. After Sulieman's arrest, he was interviewed by FBI Agents in Entebbe, Uganda.  During the interview, Sulieman told the FBI his telephone number was 254722366634. This was the same number  found  in Fidse's memory  card. Sulieman is currently detained in Uganda awaiting to be tried  for his role  in  the bombings, but has not been convicted.

## **Argument**

The defendant pled guilty to both Conspiracy to Obstruct an Immigration Hearing and Conspiracy to Obstruct a Terrorism Investigation.  The facts in this memorandum and the evidence to be presented at the sentencing hearing are true.  The Presentence Investigation Report (PSI) accurately reports the relevant facts and correctly calculates the sentencing guidelines calculations for the defendant.

### 1.    **Relevant Conduct**

Defendant's objections "to all facts Fidse did not explicitly agree to during his guilty plea hearing," (Defendant's Objections Letter dated June 3, p. 1), are clearly contrary to what the sentencing court can and should consider when determining relevant conduct.  The Sentencing Guidelines clearly state that the guideline range

shall be determined on the basis of the following:

**(1)(A)** all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

**(B)** in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G., § 1B1.3.   The defendant cannot limit the true facts and tailor the factual basis to the guilty plea to eliminate and prevent the district court from determining relevant conduct as the defendant now attempts.

The facts listed above come from hours of tape recordings between the defendant and CHS 1, which all were in English, and between the defendant and CHS 2 or Defendant Sheikh.  Many of the calls between Defendants Fidse and Sheikh, while in the Somali language, were translated accurately and fairly and/or reviewed by the same interpreter hired by Defendant Fidse to transcribe and translate the Somali conversations between Defendant Fidse and CHS 2; the defendant cannot fairly challenge the accuracy of these extensive conversations when the transcripts were done by the same interpreter he relied on for his trial transcript/translations. Defense counsel has provided alternative translations of the CHS 2 conversations.  The translations were also done by one of the FBI contract interpreters for the ERO calls.  While the defense's translations are materially the same given the language differences, the defense translations include favorable statements for the government where the government translations

were listed as inaudible, i.e., the defense translation includes a statement from the defendant where he says, **"We are terrorists."** The remaining evidence comes from the defendant's own statements to the JTTF agents and DHS immigration agents, extensive immigration hearing testimony under oath, the statements of Defendant Fidse's coconspirator.  Contrary to the defendant's objections, CHS 2 has no difficulty distinguishing the voices on the transcripts as he was a party to the conversation.  The transcripts as set forth in the Appendix to this memorandum are accurate and parties are correctly identified in the government's transcripts.  It is clear from the context and the similarity of translation that the defendant's transcripts corroborate the government's transcripts.  The evidence against the defendant is overwhelming; the defendant's statements show he conspired to obstruct justice in the immigration hearing and then conspired to make false statements in a terrorism investigation, which is exactly why the defendant pled guilty to both charges.

### 2. <u>Terrorism Enhancement</u>

The Joint Terrorism Task Force (JTTF) began investigation Fidse because of Fidse's open discussions with CHS 1 of his support for violent, radical Jihad, and the killing of non-Muslims, and his admiration for Osama Bin Laden.  After the JTTF investigation began, Fidse was recorded by CHS 1 as Fidse  talked about a hypothetical plot to assassinate the U.S. Ambassador to Kenya to include details about how the attack would take place.  While defense counsel mentions the polygraph of CHS 1, she negates to say that in fact CHS 1 passed the polygraph examination regarding the information he claimed Fidse stated.  Furthermore, the conversation CHS 1 has

with Fidse about the hypothetical plot to kill the U.S. Ambassador to Kenya after FBI polygraphed CHS 1 were recorded.

On June 3, 2009, Fidse further discussed with CHS 2 the cost of an armed vehicle, and indicated "our vehicles were burned... the vehicles were burned in Egale (a village in Somalia)... all the boys on the vehicle were killed."    On June 11, 2009, continued to discuss costs of the armed technical he paid for and how to arm it.  Fidse also discussed terrorizing the infidels and stated, "...you know what is says, gather your horses and weapons and terrorize the infidel...  The Koran declares it, to gather your weapons to cause fear and terror to the enemies of God."  The defendant, as shown in the defendant's own transcript, says "We are terrorists."  Contrary to defendant's arguments that the above statements and the ones to follow cannot be attributed to Fidse, CHS 2 definitively states that the parties in the government transcripts are correctly identified and Fidse did in fact make the above statements.  Furthermore, the government will provide testimony that the defendant's June 3, 2009, transcript translation, that "Speaker 3" is Fidse and "Speaker 2" is CHS 2 and that the language is materially same in both the government and defendant's translations. The government will provide testimony that the defendant's June 11, 2009, Part 4 and 5, transcript translation, that "U/M"or "UNKNOWN MALE" is Fidse and "Speaker 1" is CHS 2 and that the language is materially same in both the government and defendant's translations.

Fidse discussed with CHS 2 Fidse's admiration for the deceased leader of the Al-Shabaab, Aden Ayrow, who was one of seven militants killed in a U.S. air strike on May 1, 2008. Specifically, Fidse stated, "Like Ayrow did, the infidels must suffer some consequences.  The guy was a real man.  I swear he was a real man.  I always wondered about the guy but now I understand.

12

We're not relatives [Ayrow], I swear, the day he was killed I was in Sharjah... No, the day Ayrow was killed I was in the UAE [United Arab Emirates], I swear in Allah's name, I was in tears. I called Somalia and was told it was true..." The defendant also discusses his immigration case before Judge Castro. The defendant's arguments that his positive statements regarding Al-Shabaab leader Ayrow stem from a misunderstanding over the cultural context that Somalis merely thought of Ayrow as a strong leader is a ridiculous argument given that, according to Fidse, Ayrow was the leader of the group that allegedly murdered his father.

Thereafter, Fidse appeared to praise the leader of the Taliban in Afghanistan. Specifically, Fidse stated "...like Sheikh Mullah, may Allah shower peace on him, in Afghanistan. He had the title of the leader of the believers. Infidels were not allowed in that country... He (Mullah) said that he was forced to join the Jihad after seeing what was being done to our Palestinian brothers, Chechnya, Bosnia, Sudan, Somalia..."

Fidse appeared to discuss participating in fighting. Specifically, Fidse stated the following: "when the Ethiopians saw the footsteps of 20 of us, not even 300 Ethiopian troops dared to follow us. Three hundred of them did not dare to follow 20 people. Sometimes they tried to attack *us*. When they see that we were about one kilometer away, they used to crawl. And when the shooting starts, they used to run away..." Thereafter, Fidse discussed how they buried deceased Ethiopian soldiers and stole money and watches from the corpses. Fidse told CHS 2 "It's dangerous to die without ever being in jihad." Finally, Fidse provided details on how to purchase weapons in Somalia, and how to arm a "technical vehicle."

13

Amongst other terrorism crimes the FBI was investigating Fidse for, the FBI was specifically looking at Fidse's admissions relating to providing the armed technical to Al Shabaab as Providing Material Support to a Foreign Terrorist Organization in violation of 18 U.S.C. § 2339B.  When questioned by the FBI and warned they were conducting a terrorism investigation, the defendant repeatedly lied and obstructed the investigation into his past and his potential terrorism ties and activity.

Furthermore, when attempting to determine the extent of Fidse's terrorism ties, the defendant continued to deny these ties, which in fact did obstruct the terrorism investigation and the FBI's attempt to determine whether there was a current terrorism threat from Al-Shabaab. Had the defendant truthfully told the FBI about his terrorism ties on December 9, 2009, this may have potentially averted a terrorism attack.   Fidse telephone memory card showed "254722366634 H- mohamed." This telephone number was the same number linked to Mohamed Hamid Sulieman (Sulieman) also known as Abu Zanaib, who is currently facing charges for the July 7, 2010, suicide bombings carried out against crowds watching a screening of the 2010 FIFA World Cup Final at two locations in Kampala, Uganda which left 74 dead and 70 injured.  The Al-Shabaab publicly claimed responsibility for these attacks.  The Wall Street Journal quoted an unnamed Al-Shabaab senior leader as follows, "We have reached our objective. We killed many Christians in the enemy capital (Kampala)."

The defendant plead guilty to Count 2, Conspiracy to Make False Statements in a Terrorism Investigation.  The factual basis as the government was prepared to prove at trial and put forth by the government at the time of the plea, whether or not it was agreed to by the defendant, as well as all other relevant conduct as set forth above makes U.S.S.G. § 3A1.4

applicable to the defendant.

U.S.S.G. § 3A1.4, states that:

If the Offense is a felony that involved, **or was intended to promote**, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

In each such case, the defendant's criminal history category...shall be Category VI.

(Emphasis added.)  *U.S. v. Ashquar,* 582 F.3d 819, 826 (7th Cir. 2009).

U.S.S.G. § 3A1.4, Application note 1 defines "Federal Crime of Terrorism" as the meaning used in 18 U.S.C. 2332b(g)(5).  Under 18 U.S.C. 2332b(g)(5), Providing Material Support to a Foreign Terrorist Organization in violation of 18 U.S.C. § 2339B, is defined as a federal crime of terrorism.

U.S.S.G. § 3A1.4, Application note 2(B), states

For purposes of this guideline, an offense that involved obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism.

In *United States v. Graham*, the Sixth Circuit held that a defendant who intends to promote a federal crime of terrorism is not necessarily required to have been convicted of committing, attempting to commit, or conspiring to commit a federal crime of terrorism as defined in § 2332b(g)(5).  The majority concluded that "intended to promote" implied that "the defendant has as one purpose of his substantive count of conviction of his relevant conduct the intent to promote a federal crime of terrorism…the offense of conviction itself need not be a 'federal crime of terrorism.'"  The court observed that this interpretation is in harmony with the

principles outlined in § 1B1.3 (Relevant Conduct), under which a defendant's offense level may be adjusted for acts which the defendant did not necessarily commit but were committed by others in furtherance of a jointly undertaken criminal activity with the defendant and were reasonably foreseeable to the defendant in connection with that activity.  The *Graham* majority concluded that the objects of the offense of conviction, conspiracy, constituted federal crimes of terrorism. As a result, the terrorism enhancement could be applied and the application of § 3A1.4 does not merely hinge upon whether the object crime of the conspiracy is one enumerated in  § 2332b(g)(5). *U.S. v. Graham*, 275 F.3d 490, 517-518 (6th Cir. 2001); *see also, U.S. v. Mandhai*, 375 F.3d 1243, 1247-48 (11th Cir. 2004).

In *Ashquar*, the Seventh Circuit stated:

> Thus, intent to obstruct a[ terrorist] investigation is enough, at least where obstructing an investigation promotes the crime.  We agree.  Promoting a crime includes helping and encouraging that crime, and one way of furthering a crime is to try to prevent the government from finding out about it.  So long as the sentencing court finds that the defendant intended to obstruct an investigation into a federal crime of terrorism, as opposed to an investigation into more ordinary violations of the law, the court has found the intent required to apply § 3A1.4.

*United States v. Ashquar,* 582 F.3d 819, 826 (7th Cir. 2009); *United States v. Christianson,* 586 F.3d 532, 540 (7th Cir. 2009);  *but see United States v. Biheiri*, 356 F.Supp.2d 589 (EDVA 2005)(actual obstruction of investigation required for § 3A1.4 enhancement).  Contrary to defendant's argument, *United States v. Awan*, is of cold comfort to the defendant.  (Defendant's Objections at 3).   In *Awan*, the Second Circuit stated

> To summarize, we confirm what we noted in *Stewart* and join the other Circuits that have held that "[a] defendant who intends to promote a federal crime of terrorism has not necessarily completed, attempted, or conspired to commit the crime; instead the phrase implies that the defendant has as one purpose of his

16

substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism." *Graham*, 275 F.3d at 516; *see also Stewart*, 590 F.3d at 137; *Arnaout*, 431 F.3d at 1002; *Mandhai*, 375 F.3d at 1248. **It follows that § 3A1.4 may apply without a showing that the defendant's conduct constitutes an offense listed in 18 U.S.C. § 2332b(g)(5)(B) or satisfies the "calculation" requirement set forth in 18 U.S.C. § 2332b(g)(5)(A).**

*United States v. Awan*, 607 F.3d 306, 315 (2nd Cir. 2010)(Emphasis added).

The defendant not only attempted to obstruct the investigation by lying to the agents, instructing Sheikh to lie to the agents, and instructing Sheikh to have their records and fingerprints in Kenya destroyed, he did in fact obstruct the investigation into his background and terrorism ties by lying to the agents and causing Sheikh to lie to the agents.   Additionally, to illustrate the point that much of the information that the defendant claims is true is in itself suspect.  The defendant has told the court that he was born on February 20, 1989.  PSR at 2.   Initially, during the immigration hearing of December 15, 2008, the defendant initially told the court he was born on February 20, 1986.  Govt. Ex. 3b at 27.  His false Kenyan passport that he traveled on from Nairobi to the Netherlands shows his birthday to be February 25, 1984.  Govt. Ex. 29b.

The defendants was charged and pled guilty to conspiracy to make false statements in a terrorism investigation; this charge, by its very nature, includes an attempt to obstruct a terrorism investigation.   The Presentence Investigative Report correctly determines that U.S.S.G. § 3A4.1, the enhancement for terrorism crimes is applicable to Defendant Fidse's guideline calculation.

### 3.  Obstruction of Justice

The defendant's characterization that he did not obstruct justice and did not extensively coach Sheikh as to how she needed to falsely testify at the immigration hearing is a ridiculous

assertion.  On at least six occasions, the defendant not only told Sheikh what lies to testify to at the immigration hearing in order to stay consistent with the false statements they made previously, he told her what hand signals to look for so that her story would not conflict with his.  Moreover, he called Sheikh to warn her about the JTTF terrorism investigation and to repeat the same lies to the JTTF agents as well as to contact an individual in Kenya to have their records and fingerprints taken out of the government system.  Based on other telephone conversations, Fidse had his family members, including his sister Sahra, call and visit Sheikh to pressure her to continue lying to the authorities on behalf of Fidse.  Additionally in her proffer, Sheikh admitted that Fidse directed her to continue to obstruct the immigration proceedings by lying and to lie to the JTTF in the terrorism investigation.

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation ... of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct....

U.S.S.G. § 3C1.1.  Application Note 4, clarifies that the obstruction enhancement is applicable if defendant's conduct included:

> **(B)** committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction;

> **(D)** destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding ... or attempting to do so....

> **(F)** providing materially false information to a judge....

U.S.S.G. § 3C1.1.

The defendant clearly attempted to obstruct justice during the immigration hearing by lying to the immigration judge, suborning Sheikh's perjury to the immigration judge, directing Sheikh to lie to the FBI as they conducted their terrorism investigation, and attempting to get Sheikh to make contact with an individual in Kenya to have their records and fingerprints wiped from government records in Kenya to cover up their crimes in the United States. The probation office correctly calculated the obstruction enhancement pursuant to U.S.S.G. 3C1.1.

### 4. <u>Substantial Interference with the Administration of Justice</u>

The Presentence Investigative Report correctly attributes the enhancement pursuant to U.S.S.G. 2J1.2 for Substantial Interference with the Administration of Justice.

> "Substantial interference with the administration of justice" includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

U.S.S.G. § 2J1.2, Application note 1.

To prove Fidse resided in Kenya, the United States took the extraordinary step and submitted a request to the Kenyan government pursuant to a Mutual Legal Assistance Treaty (MLAT). Pursuant to the MLAT request, the Kenyan government and FBI agents stationed in Kenya conducted an investigation in Kenya. After a thorough search of their records, the Government of Kenya (GOK) provided FBI with a letter regarding Fidse which indicated Fidse possessed a GOK passport (A902106) and a GOK national identity car (No. xxxxx409), both of which the GOK believed were fraudulently obtained since Fidse was not a Kenyan citizen. Additionally, in a video conference interview, the second highest immigration official in

the Kenyan government, who was scheduled to be a witness at trial, stated that according to their records, Fidse used a fraudulently obtained  Kenyan passport to travel from Nairobi to the Netherlands in 2006, contrary to Fidse's assertions that he never left Somalia until he began his journey to the United States.  The investigation also determined, that there were Kenyan witnesses that provided statements indicating that Fidse resided in Eastleigh between 2003 and 2008.   In her post-guilty plea debriefing, Deka Sheikh recognized the photocopy of the Kenyan passport as the one Fidse used when they left Kenya on the way to the U.S. and which he did not take with him when they crossed the border to the U.S.  Fidse lied to the JTTF when he maintained he never left Somalia until his father was murdered in June 2008.

## 5.  Acceptance of Responsibility

U.S.S.G. § 3E1.1, Application note 4, states

Conduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.

For the reasons set forth in the Obstruction of Justice section, *supra* at 14-15, the defendant is not entitled to points for Acceptance of Responsibility.  Furthermore, the United States had finalized its preparations for trial by the time the defendant entered his guilty plea.

## 6.    Leadership Role

U.S.S.G. §3B1.1 states

**(a)** If the defendant was an organizer or leader of a criminal activity that involved

20

five or more participants or **was otherwise extensive**, increase by 4 levels.

Application Note 3 states

> In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.

In the case at hand, the defendant involved Fidse having his family members such as his sister in Minnesota encouraging Sheikh to lie to U.S. officials before entering Mexico and then later after FBI interviewed his sister about Fidse's terrorism ties, having his uncle lie sign an affidavit in support of Sheikh's immigration status and then to FBI agents in North Carolina stating that Sheikh and Fidse knew each other since they were children, as well as all of the other individuals involved with the smuggling ring.  The defendant's actions qualify for the 4-point leadership enhancement.

Assuming *arguendo* the 4-point enhancement does not apply, at the very least, the defendant should be assessed a 2-point leadership enhancement pursuant to U.S.S.G. §3B1.1(c): "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels."

**7.     Variance for Immigration Custody**

The defendant's request that he be given a variance for the time spent in immigration custody is without merit.  At any time prior to being charged, he was free to return to Somalia.  He chose instead to go to extraordinary steps to lie to and obstruct the immigration court and the JTTF agents of the United States in order to prevent his deportation.  The government may not

know all of the reasons the defendant chose to stay besides Fidse's statements regarding his support for terrorists, but he is no more entitled for a variance for his choice to stay in the United States than the government would be entitled to a variance because of the difficulty in involuntarily removing the defendant back to Somalia and his eventual release to American society.  The defendant should and will be given credit for his time served on these charges; he should not be given credit for the time he voluntarily chose to remain in immigration custody in his attempt to fraudulently obtain immigration status and continue to lie to the JTTF agents in a terrorism investigation.  *See also United States v. Sanchez*, 478 Fed.Appx. 919 (5th Cir. 2012)(No error in refusing variance for time spent in state and immigration custody).

Respectfully submitted,

ROBERT PITMAN
United States Attorney


By:      /s/
MARK T. ROOMBERG
Assistant United States Attorney
State Bar No. 24062266
601 N.W. Loop 410, Suite 600
San Antonio, Texas  78216
Tel: (210) 384-7100

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of July 2013, a true and correct copy of the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF System which will transmit notification of such filing to the following CM/ECF participant:

Molly Roth, Esquire

Molly_Roth@fd.org


Margarita Garbalena

U.S. Probation Officer

Margarita_Garbalena@txwp.uscourts.gov


/s/_____

MARK T. ROOMBERG

Assistant United States Attorney